Filed 2/19/21  In re R.P. CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| In re R.P., a Person Coming Under the Juvenile Court Law. | 2d Juv. No. B307102 (Super. Ct. No. 20JV00214) (Santa Barbara County) |
| SANTA BARBARA COUNTY CHILD WELFARE SERVICES, Plaintiff and Respondent, v. M.P. et al., Defendants and Appellants. | |

M.P. (Mother) and R.L. (Father) appeal from the juvenile court's jurisdiction and dispositional orders.  (Welf. & Inst. Code, § 395, subd. (a)(1).)[1]  We affirm.

---

[1] All statutory references are to the Welfare and Institutions Code.

## FACTS

Mother and Father are hearing impaired and communicate in sign language. They have a daughter, R.P., who was 16 years old at the time she was removed from her parents' home.

In May 2020, R.P. found texts on Father's tablet that suggested he was having an affair. R.P. showed the texts to Mother. An argument ensued between the parents with R.P. present. Mother slapped Father, and R.P. intervened to protect Mother. Father threw R.P. to the ground, injuring her knee. R.P. ran to her paternal grandmother's (Grandmother) house, who lived next door. R.P. refused to return home. The parents called the sheriff to help get R.P. to come home.

R.P. told the Child Welfare Services (CWS) social worker who arrived at Grandmother's house that Mother blamed her for the fight and that she felt unsafe with Father at home. As the social worker was talking with R.P., Father drove by Grandmother's house and yelled, "Stay out of my business." Father did not know the social worker was present.

### Criminal History

Father has had multiple convictions for inflicting corporal injuries on a spouse dating back to 1998. Mother was convicted of obstructing a peace officer in 2003.

In August 2018, Mother called R.P. at school to inform her that she was going to harm herself. R.P. called the sheriffs. When the sheriffs arrived, Mother was sitting on a recliner unconscious with an empty pill bottle next to her. Father was gesturing for the deputies to leave. Father obstructed access to Mother by medical personnel.

R.P. reported that her parents were having an altercation. Father jumped on Mother while she was in bed and struck her,

2

leaving visible marks.  Father was arrested for inflicting corporal injury on a cohabitant.

*Detention Hearing*

The trial court held a detention hearing at which it found a prima facie showing was made that R.P. is a person described in section 300.  The court ordered that R.P. be placed with Grandmother with supervised visitations with Mother and Father.

*Jurisdictional Hearing*

The jurisdictional hearing was continued to the disposition hearing.  The trial court ordered a disposition report.

The parents requested that someone other than Grandmother supervise Father's visitation.  The trial court so ordered.

*Disposition Hearing*

(a)  Disposition Report

Mother stated that Father used cocaine and pain medication, and that she is afraid of him when he is on drugs. Mother denied having overdosed.  The report contained information on Mother's mental health problems and her inability to protect R.P.

Father stated he had a difficult childhood and blamed Grandmother.  He also blamed her for the incident that led to R.P.'s detention.  The report detailed numerous incidents of Father's display of anger during CWS's involvement.

R.P. stated she was fearful of Father and would only feel safe around Father if a police officer was present.  She stated that Father hits Mother, and she does not know why Mother continued to take Father back.

(b)  Contested Hearing

1.  Father's Testimony

Father denied that he threw R.P. to the ground, but admitted that she had fallen.  He said he had not spoken to Grandmother in 10 years, and blamed R.P.'s estrangement on Grandmother.  Father said he would comply with the case plan except for the mental health assessment.

2.  Mother's Testimony

Mother said she did not feel comfortable with Grandmother because Grandmother is not friendly.  Mother said that several times R.P. had come to her house unsupervised when Father is not there.  This concerns Mother because she does not want to get into trouble.  R.P. tells Mother that Grandmother knows she is there.

Mother was asked if she had a plan for what she would do if she and Father had a fight.  She initially responded no.  When asked again, she said she would plan not to argue.  Asked a third time, she said Father would go to his cousin Tony's house and she would stay home.  They would talk when things cooled down.  When asked where Father would live if R.P. is returned home, Mother replied that Father would live with them.

Mother said she would comply with the case plan.

3.  Grandmother's Testimony

Grandmother said her relationship with Father is tumultuous.  Father does not like her, but she does not know why.  Until recently, she had a good relationship with Mother.  Grandmother denied making disparaging remarks about Father to R.P., and said she could support reunification.  She said R.P. was welcome to stay with her.

4

### 4. Michael "Tony" W.'s Testimony

Michael W. is Father's cousin. He supported Father's contention that Grandmother was undermining Father with R.P. He described Grandmother's relationship with Mother as "[n]ot very good." He said that if the family was placed in family maintenance and a problem arose, he would go immediately to assist. He admitted, however, that he was aware of the incident that led to R.P.'s detention, but he did not go immediately to the house because he had a 3:00 a.m. meeting.

### 5. Social Worker's Testimony

Social worker Yuri Gomez testified that R.P. did not feel safe at home, and did not want to participate in visits with Father. Mother was not able to keep R.P. safe. R.P. had a positive relationship with Grandmother, but her parents did not. Grandmother had been supervising R.P.'s visits with Father, but R.P.'s visits with Father would be supervised by a CWS case worker going forward.

Gomez testified that CWS considered returning R.P. to Mother with Father living elsewhere. Mother suggested that she might move in with her mother so that the child could live with them separate from Father. Mother was supposed to talk with her mother to see if she agreed with that plan, but Mother did not follow up.

*Ruling*

The trial court found that reunification should occur, but not before reunification services are rendered. In the interim, R.P. should be removed from the parents' home and remain placed with Grandmother.

5

DISCUSSION

I

*Substantial Evidence*

Mother and Father contend the trial court's removal order is not supported by substantial evidence.

Before removing a child from parental custody, the trial court must find by clear and convincing evidence (1) there is or would be a substantial danger to the child's physical or emotional health, safety, protection, or well-being if the child is returned to the parents; and (2) there is no reasonable means of protecting the child without removing her from her parents' physical custody. (§ 361, subd. (c); *In re D.D.* (2019) 32 Cal.App.5th 985, 996.)

Mother's and Father's contention is based on a view of the evidence most favorable to themselves. But that is not how we view the evidence. When presented with a challenge to the sufficiency of the evidence under the clear and convincing standard, we must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made a finding by the high probability required by the standard of proof. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.)

(1) Danger to Physical or Emotional Well-Being

Here the evidence shows Father has a history of domestic violence. R.P. feels the need to protect Mother from Father. Mother cannot protect R.P. from Father. R.P. fears Father and does not want to visit with Father unless a police officer is present. Father has physically injured R.P. There is overwhelming evidence that R.P.'s physical and emotional well-being would be endangered if she is returned to her parents.

6

(2) No Reasonable Means of Protecting R.P.

Here the evidence shows that Mother refuses to leave Father. R.P. complains that Mother continues to take Father back in spite of his physical violence toward her. When it was suggested that Mother and R.P. move in with the maternal grandmother without Father, Mother failed to follow up. As long as Father continues to live in the household, R.P. cannot be protected. Father argues he will be under court orders and CWS supervision. But court orders and CWS supervision will not alleviate R.P.'s well-justified fear of simply being in her Father's presence. There is overwhelming evidence that there is no reasonable means of protecting R.P. without removing her from her parents' custody.

Mother points out that R.P. has been visiting her without incident. But what Mother ignores is that Father is not at home when the visits occur and the visits last only a few hours.

Mother suggests that she and Grandmother be given shared custody. But Mother is unwilling and unable to protect R.P. Mother is also unwilling to eliminate Father from her life. In fact, Mother blames R.P. for the incident that led to R.P.'s removal. Moreover, Mother and Grandmother do not get along. Shared custody would put R.P. in the middle. Shared custody is not a viable alternative.

Mother relies on the trial court's statement, "The safety measures next door that have been argued that exist . . . may or may not exist." Mother argues the trial court's finding that reasonable alternatives to removal may or may not exist falls far short of clear and convincing evidence that removal was the only way to protect R.P. But the trial court did not say reasonable alternatives to removal may or may not exist. The court said the

7

safety measures Mother claims exist or may not exist. The court is simply unwilling to gamble with R.P.'s safety if she is returned to the custody of her parents. Thus, there is no reasonable alternative to removal.

The evidence here is well beyond clear and convincing. R.P. has good reason to fear Father. Mother cannot protect her.

## II

Mother and Father contend there is no substantial evidence that reasonable efforts were made to avoid removal.

The trial court found that reasonable efforts were made to avoid removing the child from the home. (§ 361, subd. (e).)

The evidence showed that prior to R.P.'s detention CWS scheduled a meeting with Mother and Father to develop a safety plan for R.P. Mother and Father were given notice by text, e-mail, and phone call. Present at the meeting were Mother, R.P., Grandmother, CWS social workers, and a sign language interpreter. Father did not participate. During the meeting, however, Father called Mother and began to argue with her. Father texted the social worker that he would not attend the meeting because he did not receive notice in a different format.

During the meeting, Mother agreed that the concerns of CWS were valid. When asked what Mother would do to keep R.P. safe, she replied that she did not know what to do. She said R.P. would be safer in Grandmother's home. Mother said she was not ready to leave Father, even though R.P. did not feel safe around him.

That is substantial evidence CWS made substantial efforts to avoid removing R.P. from her parents' home. CWS tried to create a safety plan for R.P., but Father refused to cooperate and

8

Mother refused to leave Father. Even Mother conceded R.P. would be better off with Grandmother.

Mother and Father complain that the trial court made no factual findings to support its conclusion that reasonable efforts were made. The court made the ultimate finding that reasonable efforts were made, but not specific factual findings. The error was harmless. It was obvious R.P. needed to be removed from her parents' home, if not for her physical safety, then for her emotional well-being. R.P. has repeatedly stated that she fears Father and does not want to visit him without a police officer present. That Father will be under court orders and CWS supervision will not solve the problem.

### III

### *Placement with Grandmother*

Mother contends the trial court abused its discretion in placing R.P. with Grandmother.

Mother's contention is based on the theory that because Grandmother had a contentious relationship with her and Father, the placement would not facilitate reunification efforts.

It is true that Grandmother has a strained relationship with Mother and Father. But R.P. is comfortable living with Grandmother, and Grandmother said she would support reunification efforts. CWS reported that Grandmother has been cooperative.

The only alternative placement suggested by Mother is placement with Father's cousin, Michael W. or Michael W.'s mother. CWS explored placement with Michael W., but he expressed his reluctance to accept placement. Michael W. said his mother lives in the Bay Rea. The trial court could reasonably

9

conclude that placement in the Bay Area would hinder reunification.

The trial court did not abuse it discretion in placing R.P. with Grandmother.

IV

*ICWA*

Mother and Father contend the trial court failed to comply with the Indian Child Welfare Act (ICWA). (25 U.S.C. § 1901 et seq.; § 224.2.)

ICWA provides: "In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention." (25 U.S.C. § 1912(a).)

An "Indian child" is "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4).)

ICWA does not itself impose a duty to inquire whether a child is an Indian child. That duty is imposed by federal regulations. (25 C.F.R. § 23.107(a).) In section 224.2, California has enacted a statute that parallels the federal regulations.

Section 224.2, subdivision (c) provides: "At the first appearance in court of each party, the court shall ask each participant present in the hearing whether the participant knows or has reason to know that the child is an Indian child. The court shall instruct the parties to inform the court if they subsequently

10

receive information that provides reason to know the child is an Indian child." Subdivision (d) of the section lists six circumstances, any one of which constitutes reason to know. The only circumstance that is potentially applicable here is in subdivision (d)(1): "A person having an interest in the child, including . . . a member of the child's extended family informs the court that the child is an Indian child."

Subdivision (e) of section 224.2 is particularly pertinent here. It provides, in part: "If the court, social worker, or probation officer has reason to believe that an Indian child is involved in a proceeding, but does not have sufficient information to determine that there is reason to know that the child is an Indian child, the court, social worker, or probation officer shall make further inquiry regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable."

Here Mother checked a box on an ICWA form that states, "I am or may be a member of or eligible for membership in a federally recognized Indian tribe." In the blank that follows, Mother wrote "Apache." Father checked the same box on his ICWA form naming Blackfoot, Cherokee, and Choctah. Mother told a social worker that she had "heritage through the Apache tribe from the Mexican area." When the trial court asked Father about his Indian heritage, Father told the court he has "three different credible . . . ," but the interpreter was unable to interpret the rest of his statement. Father told a social worker that he had Cherokee and Blackfoot ancestry, but he was not recognized by any tribe.

The CWS disposition report states that the ICWA investigation was ongoing and that an update would be provided

11

to the court when more information was available.  The trial court made no ICWA findings.

CWS points out that Mother and Father cite no authority for the contention that the ICWA investigation must be complete prior to the disposition hearing.

In addition, CWS contends no ICWA investigation is required.  CWS relies on *In re Austin J.* (2020) 47 Cal.App.5th 870 (*Austin J.*).  In *Austin J.*, mother told a social worker that she may have some Cherokee heritage.  She did not check any of the boxes on the ICWA form indicating tribal membership.  The trial court found it does not have reason to know that the child is an Indian child as defined by ICWA.  No notice was given to any tribe.  The court ordered the children to be placed in foster care.  The Court of Appeal affirmed.

In discussing the "reason to know" standard, the Court of Appeal in *Austin J.* noted that until 2016 the standard was " 'information suggesting the child is a member of a tribe or eligible for membership . . . .' " (*Austin J.*, *supra*, 47 Cal.App.5th at p. 885.)  That standard was changed to "reason to know that a child" "*is* an Indian child." (*Ibid.*)  In formulating the standard, the Bureau of Indian Affairs (BIA) expressly rejected more inclusive language such as "is or *could be* an Indian child" or "*may be* an Indian child." (*Ibid.*; citing Seiser & Kumli, Cal. Juvenile Courts Practice and Proc. (2020) Disposition Hearing, § 2.125[1], p. 2-419 [ICWA " 'does not apply to the many children involved in juvenile dependency proceedings who merely have some vague, distant or possible Indian heritage' "].)  The Court of Appeal concluded mother's vague statements that the child may have some Cherokee heritage do not constitute information that the child is an Indian child.  Tribal membership, not mere Indian

heritage, is required for a child to be an Indian child under ICWA.  Thus, the trial court did not err in failing to give the tribe notice of proceedings.  (*Austin J.*, at p. 887.)

The *Austin J.* court next discussed the "reason to believe" standard under section 224.2, subdivision (e) requiring further investigation.  The court noted that "reason to believe" is broader than "reason to know."  (*Austin J.*, *supra*, 47 Cal.App.5th at p. 888.)  Nevertheless, a "reason to believe" requires a logical connection between facts and the belief.  (*Ibid.*)  Information about a tribal connection that is too vague, attenuated, and speculative will not support a reason to believe.  (*Ibid.*)  Not everyone with Indian ancestry is a member of an Indian tribe or the biological child of a member of an Indian tribe.  (*Id.* at p. 889.)  Indian ancestry without more does not provide a reason to believe that a child is a member of a tribe or is the biological child of a member.  (*Ibid.*)  Thus, a mere claim of Indian ancestry does not impose a duty to make further inquiry.  (*Ibid.*)

The only difference between this case and *Austin J.* is that here Mother and Father checked a box on their ICWA forms stating, "I am or may be a member of or eligible for membership in a federally recognized Indian tribe."  That is not a material difference.  The language "I am or may be" eligible for membership in an Indian tribe is too broad to be meaningful.  Anyone with even the vaguest claim to Indian heritage could check that box.  In fact, statements made by Mother and Father to social workers and the court show they have only a vague claim to Indian heritage.  That is not enough to support either "reason to know" or "reason to believe" the child is an Indian child.  Even had the statement attached to the box been more precise, simply checking a box on a form is insufficient where

13

inquiry of the person checking the box discloses it is based on nothing more than a claim of Indian heritage. Indian heritage is not enough to qualify as an Indian child. The child must be either a member of a tribe or the biological child of a member of a tribe. (25 U.S.C. § 1903(4).)

The court in *In re T.G.* (2020) 58 Cal.App.5th 275, 294-297, disagreed with *Austin J.'s* conclusion that the mere claim of Indian ancestry does not trigger the duty to make further inquiry. The court in *T.G.* stated: "[T]he imposition of a duty to inquire that is significantly more expansive than the duty to provide ICWA notice is premised on the commonsense understanding that, over time, Indian families, particularly those living in major urban centers like Los Angeles, may well have lost the ability to convey accurate information regarding their tribal status. . . . As a result, the information available at the outset of dependency proceedings will often be inadequate to ensure the necessary protection of the rights and cultural heritage of Indian children, Indian families and Indian tribes. [Citation.] General information from the family about its ancestry frequently provides the only available basis to believe an Indian child may be involved." (*Id.* at p. 295, fn. omitted.)

We believe that *Austin J.* is better decided. As *Austin J.* points out, and *T.G.* acknowledges, "Indian child" is defined in terms of tribal membership, not Indian ancestry. (*Austin J.*, *supra*, 47 Cal.App.5th at pp. 888-889; *T.G.*, *supra*, 58 Cal.App.5th at p. 294.) Section 224.2, subdivision (e) requires further inquiry if there is "reason to believe that an Indian child *is* involved in [the] proceeding," not "may be" or "could be" involved in the proceeding. (Italics added.)

14

In case after case, child welfare agencies have spent significant time, money, and resources in fruitless investigations of ICWA claims. Many, if not most, of these investigations are initiated and sustained by nothing more than a parent or relative's bare assertion of Indian heritage. No child is benefited by these fruitless searches, and many are harmed by the delay. Neither the legislative history of ICWA outlined in *Austin J.* (*Austin J.*, *supra*, 47 Cal.App.5th at p. 885) nor the express language of section 224.2, subdivision (e) justifies launching a search for tribal membership based on a bare assertion of Indian heritage. To require a further inquiry under section 224.2, subdivision (e), there must be some facts that would cause a reasonable person to have a "reason to believe" the child is an Indian child as defined by federal law; that is, a member of an Indian tribe or the biological child of a member of an Indian tribe. Here there are no such facts. A claim to Indian heritage is not enough.

The judgment is affirmed.

NOT TO BE PUBLISHED.


                                    GILBERT, P. J.

I concur:


        YEGAN, J.

15

TANGEMAN, J., Concurring:

I agree that substantial evidence supports the juvenile court's findings and that placing R.P. with Grandmother was not an abuse of discretion.  But I disagree with the majority's conclusion that the Indian Child Welfare Act (ICWA) has not been triggered here.  (25 U.S.C. § 1901 et seq.; Welf. & Inst. Code,[2] § 224.2.)  On this record, I would conclude otherwise.  Nevertheless, I concur in the result because Child Welfare Services (CWS) correctly points out that the ICWA investigation need not be completed—yet.

The court below did not make an ICWA finding at the dispositional hearing and the inquiry is ongoing.  Where the court orders termination of parental rights or foster care placement, it must notify the relevant tribe(s) and obtain receipt of notice by the parent/tribe/Secretary of the Interior at least 10 days before the termination or placement.  (25 U.S.C. § 1912(a); see also § 224.3, subd. (a).)  But the court did not terminate parental rights or order foster placement.  It placed R.P. with her paternal grandmother.  Unless the record states otherwise (it does not), such a placement is neither placement in foster care nor termination of parental rights.  The claim of noncompliance with ICWA is therefore premature.  (*In re M.R.* (2017) 7 Cal. App.5th 886, 904.  For that reason, we need not reach the

---

[2] Statutory references are to the Welfare and Institutions Code.

question of whether the reasoning of *In re Austin J.* (2020) 47 Cal.App.5th 870 or *In re T.G.* (2020) 58 Cal.App.5th 275 apply here.

    <u>NOT TO BE PUBLISHED.</u>


                                  TANGEMAN, J.

Arthur A. Garcia, Judge

Superior Court County of Santa Barbara

———————————————

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant M.P.

Andre F. F. Toscano, under appointment by the Court of Appeal, for Defendant and Appellant R.L.

Michael C. Ghizzoni, County Counsel, Lisa A. Rothstein, Deputy, for Plaintiff and Respondent.